#30899-a-JMK
**2026 S.D. 45**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

ANDREW MORSE and JOHN and
EMILY CLARKE, for themselves and
on behalf of all similarly situated
individuals,                                            Plaintiffs and Appellants,


            v.


STATE OF SOUTH DAKOTA, and/or
THE SOUTH DAKOTA COMMISSION
OF SCHOOL AND PUBLIC LANDS, as
successors of the SOUTH DAKOTA
CEMENT PLANT COMMISSION, and the
SOUTH DAKOTA CEMENT PLANT TRUST,        Defendants and Appellees.


APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
MEADE COUNTY, SOUTH DAKOTA

THE HONORABLE ERIC J. STRAWN
Judge

MATTHEW HUGHES
MATTHEW NIS LEERBERG
KATHLEEN R. BARROW
DAVID G. CROOKS of
Fox Rothschild, LLP
Dallas, Texas

ANTHONY VITULLO
Dallas, Texas

MICHAEL S. BEARDSLEY
MATTHEW J. MCINTOSH of
Beardsley, Jensen & Lee
Rapid City, South Dakota                Attorneys for plaintiffs and
                                        appellants

ARGUED
OCTOBER 8, 2025
OPINION FILED **07/09/26**

TERRA M. LARSON
ROBERT B. ANDERSON
JUSTIN L. BELL of
May, Adam, Gerdes & Thompson LLP
Pierre, South Dakota

ROBERT L. MORRIS
Belle Fourche, South Dakota

Attorneys for defendants and appellees.

KERN, Retired Justice

[¶1.] Hideaway Hills, a residential subdivision in Black Hawk, South Dakota, is sinking. Built atop an old, underground mine and previously reclaimed land, the subdivision is home to over 150 homeowners. Residents first noticed foundational issues including cracking and settling in the walls and basements of their homes in 2008. The neighborhood's streets also showed significant stress, and several small sinkholes opened later that year. Stability issues throughout the entire neighborhood became unmistakable in April 2020 when a large sinkhole opened on East Daisy Drive.

[¶2.] The mining history of the land underneath Hideaway Hills is at the center of Plaintiffs' claims. In the 1900s, several companies mined the land for gypsum by means of an underground mine. The South Dakota Cement Plant Commission (Cement Plant), a subdivision of the state, purchased the property thereafter for fair market value and surface mined the property for gypsum for several years. When it completed its mining operation, the State reclaimed the land to pastureland and sold it via public sale to Raymond Fuss and his son, Larry Fuss. Aware of the presence of previous underground and surface mines, Larry and a local developer, Byron Keith Kuchenbecker, then developed the land into a residential subdivision now known as Hideaway Hills.

[¶3.] When the largest sinkhole, and the catalyst of this litigation, opened in late April 2020, Andrew Morse, the class representative for the Plaintiffs, sued the State on behalf of many of the homeowners in Hideaway Hills for damages related

to the subsidence[1] and devaluation of their homes.  Plaintiffs voluntarily dismissed each of their claims against the State related to the litigation except for their inverse condemnation claim.  Under several theories of liability, they argue the State's improper reclamation of its surface mine and failure to provide subsurface support amounted to a taking or damaging under the South Dakota Constitution.  Plaintiffs allege strict liability applies to the taking or damaging element of their inverse condemnation claim.  In response, the State contends the Cement Plant's mining activities were not on private property and were not for a public use, Kuchenbecker's actions were superseding causes, and Plaintiffs' claim is barred by SDCL 15-3-1.  The parties filed cross-motions for summary judgment in the circuit court, supported by extensive deposition testimony and exhibits from which the facts in this opinion are derived.  The circuit court heard argument on the issue and granted summary judgment to the State, reasoning that Plaintiffs' inverse condemnation claim was, in essence, a tort claim, and therefore must be dismissed under sovereign immunity principles.  Plaintiffs appeal.  We affirm the circuit court on the ground that the Plaintiffs have failed to set forth a viable claim for inverse condemnation.

## Factual and Procedural History

[¶4.]        A nearly 30-foot-deep sinkhole opened in the Hideaway Hills residential community located in Black Hawk, South Dakota, on April 27, 2020,

---

1.    Under the Restatement of Torts, "[a] subsidence is any movement of the soil from its natural position."  Restatement (Second) of Torts § 817 cmt. h (1979).  Such movement can be in any direction, including "shifting, falling, slipping, seeping or oozing of the soil" or subsurface soil.  *Id.*

leading to the class action at issue. The sinkhole appeared in a resident's front yard, consuming much of the yard and adjacent residential street and exposing a large underground void. Soon after the sinkhole opened, it became apparent to the residents of Hideaway Hills that the community was built atop an old, underground gypsum mine, which was causing surface and subsurface instability. Thirteen homes were evacuated due to the instability, and around 150 homeowners experienced and are currently experiencing issues such as cracking and settling. Andrew Morse and the affected residents of the Hideaway Hills community filed suit against the State of South Dakota, among other parties, seeking compensatory and consequential damages.

[¶5.]      A brief history of the ownership and mining activity on the land at issue is necessary to provide context for Plaintiffs' claims. Dakota Plaster conducted the first recorded mining activity on the land in the early 1900s, which included both surface and underground mining. The dates of Dakota Plaster's underground mining activities are not fully documented, but it appears they mined the site for almost 30 years. Dakota Plaster used the "room and pillar" method, which resulted in a substantial network of underground tunnels and large, cavernous rooms. Existing documents revealed that Dakota Plaster supplied the Cement Plant with gypsum beginning in 1924, but it is suspected that the underground mine was inactive by 1927. US Gypsum acquired the mine from Dakota Plaster in 1930. However, because South Dakota lacked a state mine inspector from 1926 to 1936, there are no records regarding US Gypsum's mining activities during these years.

[¶6.] In 1945, Edwin Stensaas purchased the property from US Gypsum and resided in a ranch house with his family on the northwest corner of the property from 1945 until the late 1980s. Stensaas worked for Northwestern Engineering at the time. Hills Materials, a subsidiary of Northwestern Engineering, began strip mining the property for gypsum in 1946. The existing records from this time frame do not indicate that Hills Materials mined underground. In that year alone, Hills Materials supplied 2,066 tons of gypsum to the Cement Plant, and 8,703 tons of gypsum to cement plant industries in Mason City, Iowa. There is no evidence in the record to establish whether Hills Materials mined the property after 1946, but Goldie Prestjohn, Stensaas's daughter, testified by deposition that she recalled Hills Materials mining the northern area of the property into the mid-1950s. Despite her recollection, however, there is no documentary evidence in the record that indicates mining occurred on the property between 1947 and 1985.

[¶7.] The next recorded mining activity occurred when the Cement Plant, a subdivision of the State, purchased the property in 1985 from Stensaas by contract for deed for $140,000. Stensaas preserved a life estate in the property so that he could continue to reside in his home and on nearby land.

[¶8.] The Cement Plant applied for and received authority to mine the property in 1985 under Permit 424. The application for the permit was publicly filed with the Meade County Register of Deeds on June 25, 1985, and mining began in April 1986. The Cement Plant strip mined the property throughout the 1980s and into the 1990s. But, unlike Dakota Plaster, the State contends that it did not perform underground mining, instead relying on surface mining to extract gypsum.

Surface mining is conducted by digging large, open-air pits to extract the exposed minerals. Plaintiffs' experts—Doug Beahm, Nicholas Anderson, and Brandt Lyman—agreed that there is no documentary evidence that the State performed underground mining. The parties dispute the extent and location of the mining activities on the property, but no documents or historical records indicate that the State mined outside of the permit area.

[¶9.]        By 1987, the State had mined and reclaimed[2] a five-acre portion of the land in the northeastern area, which involved grading and contouring the land. Lyle Dennis, the blasting supervisor on the project, testified that part of this reclamation process involved blasting to close an underground mine entrance. Prior to closing the entrance, the State drilled six test holes in the area to determine if there was sufficient gypsum to mine. Dennis further testified that he confirmed there was insufficient gypsum to mine in that area, and that the blasted area was then graded and contoured. Morse, however, maintains that the State conducted blasting in the underground tunnels previously mined by Dakota Plaster, searching for additional deposits of gypsum.

[¶10.]        Three years into the surface mining operation, on October 6, 1989, the Department of Water and Natural Resources approved an amendment to the Cement Plant's mining permit to include a small area of land immediately south of

---

2.      "Reclamation" is "the employment during and after a mining operation of procedures reasonably designed to minimize as much as practicable the disruption from the mining operation and to provide for the rehabilitation of affected land through the rehabilitation of plant cover, soil stability, water resources, or other measures appropriate to the subsequent beneficial use of such mined and reclaimed lands[.]" SDCL 45-6B-3(14).

the permit area on resident Victor Pengra's property. The Cement Plant entered into a lease with Pengra to mine a little over half an acre of his property.

[¶11.] The Cement Plant converted their mining permit—Permit 424—to a mining license—License 89-383—in 1991 after a statutory change to SDCL chapter 45-6 transformed the system from a permitting system to a licensing system. Under the new scheme, however, the Cement Plant was still required to reclaim any land affected under the permit and the license in accordance with the terms of chapter 45-6. Both of the Cement Plant's mining applications were publicly filed with the Meade County Register of Deeds office, and the applications and associated materials, including the State's reclamation plan, were publicly accessible.

[¶12.] As required by statute, the State reclaimed the land it mined, ultimately reclaiming around 16 acres by the end of its operations. This process involved filling the previously mined locations with backfill it had preserved from prior mining activities, ensuring that the backfill was sloped according to natural grade, and then reseeding the reclaimed area with vegetation native to the area along with watering the vegetation. Prior to the State's mining activities, the area was used for pastureland, and it was reclaimed to return to "pasture condition" under the approved permit.[3] The State, when reclaiming the surface mines, used

_____

3. The State's June 24, 1985 mining permit laid out a reclamation plan to return the land to "pasture condition" in accordance with SDCL 45-6B-45 and 45-6B-7, which included removing topsoil and overburden and then backfilling and contouring the area to match existing slopes. In 1988, the regulations changed and added reclamation guidelines for "rangeland." If land is to be reclaimed to rangeland, the "[a]ffected land must have the capability to support a livestock carrying capacity that is equivalent to that of the surrounding area[.]" ARSD 74:29:07:20(1). Under the 1988 rules which

(continued . . .)

backfill from locally available materials, including pulverized gypsum.  Morse asserts this form of gypsum dissolves when exposed to water, creating piping through the soils, which creates a conduit to allow more water to enter the subgrade, leading to further instability.  Plaintiffs therefore maintain that the State improperly reclaimed the land it mined, leading to the settlement and structural issues that Plaintiffs aver caused their damages.

[¶13.]　　　　After the property was reclaimed, the State prepared it for sale.  On March 2, 1993, the State, as required by statute, had the land appraised for its "highest and best use," which the appraiser determined was for a "[r]esidential ranchette."  The land area assessed in the appraisal included both the permit area and the land that was excluded from the permit area as a result of Stensaas's life estate.  The appraisal for "residential ranchette" was a nod to the old Stensaas ranch house and outbuildings on the northwest corner of the property, which the appraiser described as in "fair condition."  The appraiser noted that the lack of utilities foreclosed the possibility of other types of developments, and that the location of a "sewer lagoon" on the southern border of the property was "considered adverse for any development on the subject in the immediate proximity of the lagoon."

_____

(. . . continued)

are still in place, reclamation to rangeland is complete "when the reclaimed range is capable of withstanding proper stocking rates for two consecutive years prior to bond release."  ARSD 74:29:07:20(4).  The State's 1989 amended permit, which incorporated the Pengra property into the permit area, included this reclamation condition.

[¶14.]	The Cement Plant began soliciting public bids for the property in April 1994. Public notice of the sale was posted in both the Argus Leader and the Rapid City Journal, and the advertisement described the property and directed all questions to Vince Street and Steve Zellmer at the Cement Plant. The State sold the property via public sale to Raymond Fuss on June 17, 1994, for $92,154, while reserving its subsurface mineral rights to the land as required by the South Dakota Constitution.[4] The deed from the State to Raymond did not contain restrictions on future development. Raymond later transferred the property to his son, Larry Fuss.

[¶15.]	Larry moved into Stensaas's house on the northwest corner in 1998. He cut hay on the land and leased it to pasture horses until approximately 2000. After the current lawsuit was filed, the parties engaged in discovery, which revealed that Larry knew the Cement Plant had previously engaged in surface mining on the property, and that he had knowledge of an existing underground mine. Larry testified by deposition that he was aware that children used to play in the underground mine, and that the Stensaases had previously used the mine as a dump for large items of trash, including old cars.

[¶16.]	Larry was approached in 2000 by Byron Keith Kuchenbecker, a local developer, regarding a proposal to develop the pastureland into a residential community. Larry suggested that Kuchenbecker develop a manufactured home park rather than a residential, stick-built development because he was concerned about the presence of an underground mine on the property. Larry testified by

---

4.	"All gas, coal, oil and mineral rights, and any other rights, as specified by law, to or in public lands, are reserved for the state." S.D. Const. art. 8, § 19.

deposition that he knew multiple companies had mined the property, but he did not know the location or extent of the mining that had occurred.

[¶17.] Kuchenbecker proposed his plan for a "Manufactured Housing Community" to the Meade County Planning Commission in July 2000. In his application, Kuchenbecker acknowledged:

> In the 1980's[,] the South Dakota Cement Plant mined the gypsum rock from the site. One can still identify spoil pile areas by abnormal terrain and exposed gypsum fragments. In the early 1900's[,] an underground gyp[sum] mining operation took place on the NE corner of the property. Field boring operation may be required to identify any cavities that may be a safety hazard.

[¶18.] At some point after the submission of his application, Kuchenbecker decided to develop a residential, stick-built community rather than one comprised of manufactured homes. This was allegedly because a member of the Planning Commission who lived nearby was more amenable to a traditional development than a manufactured housing community. Larry testified that he did not approve of the idea, and that he "still didn't recommend it for development." Larry removed himself from Kuchenbecker's development plans a short time later, selling the property to Kuchenbecker for $250,000.

[¶19.] The purchase agreement offered by Larry to Kuchenbecker contained the following disclaimer:

> 12. **CONDITION OF PROPERTY**. KUCHENBECKER [has] thoroughly researched, examined and tested the property to [his] own satisfaction and know[s] that there may be excessive rock, underground cavities, foundations, and junk underground. KUCHENBECKER accept[s] the property in an "as is" condition with no guaranty by FUSS that the property is suitable for any development contemplated by KUCHENBECKER.

[¶20.]     The Meade County Board of Commissioners voted to approve Kuchenbecker's proposal in August 2002, and he began developing Hideaway Hills, a planned residential subdivision. Kuchenbecker conducted and oversaw much of the development himself. He first leveled portions of the property and removed surface vegetation and topsoil by personally grading the surface. John Ogden, a friend of Kuchenbecker's, also helped with the development. Kuchenbecker became aware of significant issues with the subsurface of the land in early 2004 when he and his developers ran into several large underground voids while scraping the land and digging utility trenches.

[¶21.]     The first incident occurred around April 2004, when Kuchenbecker was driving a scraper over the northeast portion of the land which would later become East Daisy Drive. The wheel on the scraper fell into a hole that he described as around two to three feet wide. The hole revealed a "cavern" below that Kuchenbecker described as 40 to 50 feet deep. Kuchenbecker repelled through the hole and down into the cavern to investigate, stating the conditions were "wet and damp" and tall enough "that you could stand up in." He could not recall the length of the cavern. Kuchenbecker testified that he notified his realtor, Ron Sjodin, John Ogden, Bob Powles—a member of the Meade County Planning Board—and Doug Sperlich, his engineer, about the void. However, both Sperlich and Powles testified by deposition that they were not notified about the hole or cavern. Kuchenbecker's solution was to fill the hole back in and compact the ground. After discovering the cavern, Kuchenbecker employed American Engineering Testing (AET) to drill bore holes where he intended to build the houses on East Daisy Drive. AET drilled 25-

foot-deep bore holes in the footprint of ten houses and did not encounter voids, so Kuchenbecker continued development.

[¶22.]    Shortly after the first incident, Brandon Powles, who was digging sewer line trenches for the development, encountered another small void. He estimated that this void was six feet deep. Kuchenbecker decided to fill the hole and encase the utility pipe in steel casing. Sperlich testified by deposition that Kuchenbecker did not contact him about this second void, and that he "wouldn't want any part" of developing on land over an underground mine or gypsum deposits. Additionally, Sperlich testified that he was not aware of any compaction testing done at any point during development.

[¶23.]    Once development concluded in 2005, Kuchenbecker contracted with realtor Ron Sjodin on an exclusive listing basis to sell the lots in Hideaway Hills to individual homebuilders. The purchase agreement from Kuchenbecker to each homebuilder contained the following disclaimer:

> The BUYERS acknowledge that they have been made aware that the property being purchased hereunder, along with the adjoining property, was once mined on the surface and underground for gypsum. The SELLER is unaware as to the exact date that the underground mining ceased but believes it was sometime in the 1950's. The surface of the property was reclaimed to meet the requirements of the State of South Dakota after the surface mining operation was completed. The SELLER is not making any warranty, express or implied, concerning any sub-surface conditions that may exist on the property being purchased by the BUYER herein. It will be the BUYER'S responsibility to remediate any subsurface conditions that exist on the property including, but not limited to, fissures or cavities that may be as a result of these mining operations. The BUYER has accepted the subsurface of the property in an "as is" condition, without any warranty by the SELLER.

[¶24.]     Realtor Sjodin also represented each homebuilder on the subsequent sale to each of the homebuyers. In these purchase agreements, he did not provide the homebuyers with a disclaimer related to prior mining activity below ground like those in the contracts between Kuchenbecker and the homebuilders. The purchase agreements between the homebuilders and homebuyers did not contain any reference to mining or underground activity. When asked why he did not include a similar disclaimer, Sjodin explained that, in his opinion, no disclosure was required because such a disclosure would only be required for existing homes, not for new construction. He further stated that he did not feel the history of the mining on the property was a material defect.[5] Nearly all homebuyers lacked knowledge of the existence of underground mines or surface issues when they purchased their homes in Hideaway Hills.

[¶25.]     The Hideaway Hills Subdivision was completed around 2005, and residents began moving in shortly thereafter. Homeowners began reporting signs of settlement and cracking within their houses in 2008. The first recorded sinkhole opened on East Daisy Drive in 2008 at a home owned by Thomas and Susanne Kelly. Shortly thereafter, another sinkhole developed in their backyard, exposing the bumper of a car in the hole below. The sinkhole that triggered the present cause of action formed on April 27, 2020. The nearly 30-foot-deep sinkhole opened mere feet from the edge of a resident's home, exposing pipes and underground lines

---

5.     Sjodin did not deny his lack of transparency with the homebuyers. He testified that if he had been required to disclose the presence of prior mining activity on the property, he "would have walked away from the subdivision [project]."

that crossed beneath the subdivision. As a result of the subsurface instability, thirteen homes were evacuated and remain vacant.

[¶26.] An attorney for the Plaintiffs brought multiple lawsuits in both state and federal court against various entities including Meade County, Kuchenbecker, Sjodin, and other developers. All of these lawsuits were dismissed. Resident Andrew Morse, in November 2020, brought the present class action lawsuit against the State on behalf of the Hideaway Hills residents affected by the unstable subsurface conditions. The complaint alleged inverse condemnation, breach of duty of subsurface/subjacent support, breach of express covenant, and unjust enrichment. Morse later dismissed all claims except for the inverse condemnation claim, arguing the State "took or damaged his property for public use without just compensation," not as an exercise of a valid police power, and in violation of Article VI, § 13 of the South Dakota Constitution. Morse contends that the "failure to provide adequate subsurface support is a taking" under the state Constitution, and strict liability applies.

[¶27.] The parties filed cross-motions for summary judgment. The circuit court granted summary judgment to the State and dismissed the matter with prejudice. The court reasoned that Morse's claims sounded in tort, in that the case was primarily a tort action for withdrawal of subjacent support rather than a claim for inverse condemnation. As such, the court determined that Morse was precluded from pursuing a tort claim against the State because the State, as a sovereign entity, is immune from suit unless authorized by statute.

[¶28.] Morse appeals the circuit court's decision, arguing the circuit court erred in granting summary judgment to the State on sovereign immunity grounds and that the record supports their claim for inverse condemnation under the taking/damaging clause in Article VI, § 13. The State responds that the circuit court properly granted summary judgment based upon sovereign immunity, and also asserts several alternative grounds to affirm the circuit court, including the fact that the State owned the property at the time of its mining activities; that the State's activities on the property were not a public use; that the State's activities were not the proximate cause of Plaintiffs' alleged injuries; that the Plaintiffs lack standing because Kuchenbecker's and Sjodin's actions were superseding causes; and that Plaintiffs' claim is barred by SDCL 15-3-1.

**Standard of Review**

[¶29.] "This Court reviews a grant of summary judgment 'to determine whether the moving party has demonstrated the absence of any genuine issue of material fact and entitlement to judgment on the merits as a matter of law.'" *Rupert v. City of Rapid City*, 2013 S.D. 13, ¶ 8, 827 N.W.2d 55, 60 (quoting *Hall v. S.D. Dep't of Transp.*, 2011 S.D. 70, ¶ 9, 806 N.W.2d 217, 221). A trial court's grant of summary judgment will be affirmed "if there is any legal basis to support its ruling." *Krier v. Dell Rapids Twp.*, 2006 S.D. 10, ¶ 12, 709 N.W.2d 841, 845 (citing *Schulte v. Progressive N. Ins. Co.*, 2005 S.D. 75, ¶ 5, 699 N.W.2d 437, 438). "[I]n any takings case, the determination whether a property interest was taken or damaged for public use is a question of law for the court." *Krsnak v. Brant Lake Sanitary Dist.*, 2018 S.D. 85, ¶ 15, 921 N.W.2d 698, 702 (alteration in original) (quoting *Dep't*

*of Transp. v. Miller*, 2016 S.D. 88, ¶ 43, 889 N.W.2d 141, 154). "On appeal, an alleged violation of constitutional rights—such as whether a sufficient inverse condemnation claim exists—'is an issue of law to be reviewed under the de novo standard.'" *Id.* (citation omitted).

## Analysis

### 1. Whether the circuit court properly granted summary judgment to the State.

[¶30.] The issues of sovereign immunity and inverse condemnation are intertwined, and we address them together. The United States Constitution provides that private property shall not be "taken for public use, without just compensation." U.S. Const. Amend. V. The South Dakota Constitution supplies additional protection by providing that "[p]rivate property shall not be taken for public use, *or damaged*, without just compensation[.]" S.D. Const. art. VI, § 13 (emphasis added). "An inverse condemnation action is an eminent domain proceeding initiated by the property owner rather than the condemner." *Hamen v. Hamlin Cnty.*, 2021 S.D. 7, ¶ 18, 955 N.W.2d 336, 344 (quoting *Schliem v. State ex rel. Dep't of Transp.*, 2016 S.D. 90, ¶ 13 n.9, 888 N.W.2d 217, 224 n.9). "Inverse condemnation proceedings allow landowners to recover just compensation when eminent domain proceedings have not been instituted." *Id.* (citation omitted).

[¶31.] "Sovereign immunity is the right of public entities to be free from liability for tort claims unless waived by legislative enactment." *Truman v. Griese*, 2009 S.D. 8, ¶ 9, 762 N.W.2d 75, 78 (quoting *Pub. Entity Pool for Liab. v. Score*, 2003 S.D. 17, ¶ 7 n.3, 658 N.W.2d 64, 67 n.3). The defense of sovereign immunity does not apply to inverse condemnation claims because Article VI, § 13 of the South

Dakota Constitution "essentially abrogates sovereign immunity." *Rupert*, 2013 S.D. 13, ¶ 43, 827 N.W.2d at 71.

[¶32.]  As noted above, the South Dakota Constitution is unique and differs in important respects from the United States Constitution.  With the addition of the phrase "or damaged" in Article VI, § 13, this Court has previously held that the South Dakota Constitution provides greater protection for its citizens than the United States Constitution.  *Krier*, 2006 S.D. 10, ¶ 21, 709 N.W.2d at 846.  "The intent of the [damages] 'clause is to ensure that individuals are not unfairly burdened by disproportionately bearing the cost of projects intended to benefit the public generally.'"  *Hamen*, 2021 S.D. 7, ¶ 17, 955 N.W.2d at 344 (citing *Rupert*, 2013 S.D. 13, ¶ 9, 827 N.W.2d at 61).  A claim for inverse condemnation is maintainable where a governmental entity, through the exercise of its power of eminent domain, "causes an invasion of the land by 'water, earth, sand, or other matter or artificial structures placed upon it, so as effectually to destroy or impair its usefulness . . . [,]'" but it is not required "that the damage shall be caused by a trespass or an actual physical invasion of the owner's real estate[.]"  *Rupert*, 2013 S.D. 13, ¶ 10, 827 N.W.2d at 61 (alterations in original) (quoting *Searle v. City of Lead*, 10 S.D. 312, 73 N.W. 101, 103, 104 (1897)).

[¶33.]  The starting place for an inverse condemnation claim is to determine whether the alleged governmental invasion resulted from its exercise of the power of eminent domain under Article VI, § 13.  This section of the Constitution provides that "[p]*rivate property* shall not be taken for *public use*, or damaged, without just compensation[.]"  S.D. Const. art. VI, § 13 (emphasis added).  The Nebraska

Supreme Court's[6] opinion in *Henderson v. City of Columbus* is instructive in this regard:

> [T]he initial question is whether the governmental entity's actions constituted the taking or damaging of property for public use. That is, it must first be determined whether the taking or damaging was occasioned by the governmental entity's exercise of its power of eminent domain. Only after it has been established that a compensable taking or damage has occurred should consideration be given to what damages were proximately caused by the taking or damaging for public use.

827 N.W.2d 486, 489 (Neb. 2013). Therefore, we initially consider whether the State's actions or inaction in this case amounted to a compensable taking or damaging of Plaintiffs' private property for public use.

[¶34.]    Plaintiffs allege that the State damaged property for public use through its mining and reclamation activities on the property. The Plaintiffs claim that the Cement Plant's prior mining activities on the property created surface instability and that the State's reclamation activities were inadequate to restore the property and provide adequate surface stability for future landowners. The Plaintiffs also allege that the State failed to adequately disclose the risks to future property owners at the time they sold the property.

[¶35.]    Plaintiffs rely heavily on our decision in *Rupert v. City of Rapid City*, where we upheld the property owner's claim for inverse condemnation when the city's use of deicer on the city streets ran onto their property, killing the owners' trees. 2013 S.D. 13, ¶ 1, 827 N.W.2d at 58. Plaintiffs also cite *Long v. State*, where

---

6.    The Nebraska Constitution's takings clause is nearly identical to South Dakota's, providing that: "The property of no person shall be taken *or damaged* for public use without just compensation therefor." Neb. Const. art. I, § 21 (emphasis added).

#30899

we upheld private property owners' claims for inverse condemnation after they sustained damage from flooding caused by inadequate culverts installed along Highway 11 during the original construction and during a later resurfacing project. 2017 S.D. 79, ¶ 8, 904 N.W.2d 502, 506. In both cases, it was undisputed that the governmental invasion that damaged private properties arose from the exercise of the governmental power of eminent domain.

[¶36.]        Here, the State claims it did not damage private property because, in 1985, the Cement Plant acquired the right to mine and reclaim the property when the State purchased full property rights to the land. This included ownership of both the surface estate and the mineral estate. It is undisputed that all of the Cement Plant's mining and reclamation activities occurred while the land was publicly owned.

[¶37.]        In contrast, in *Rupert*, "the undisputed evidence established that the City's use of the deicer killed 42 mature pine trees on [private property]." 2013 S.D. 13, ¶ 16, 827 N.W.2d at 63. Similarly, in *Long*, the State's action in building a highway in 1949 and then failing to modify the drainage during a 2009 resurfacing project, and the resultant damage from flood waters, all occurred while the damaged properties were owned privately. 2017 S.D. 79, ¶¶ 2–7, 904 N.W.2d at 505–06. More importantly, the Court in *Long* specifically noted the state did not claim that the flood damage to the landowners' properties was "within the scope of the right previously acquired by the State to construct the highway." *Id.* ¶ 19, 904 N.W.2d at 510. When the State surface mined and reclaimed the land in this case, the State was acting within the scope of its right to mine and damage the land,

which it acquired when it purchased the land from Edwin Stensaas for fair market value.

[¶38.] The Cement Plant's mining and reclamation efforts, as well as its actions in selling the property, occurred while it owned the property at issue in this litigation. As such, the State's activities do not constitute a taking of "private property" because the State was entitled to commercially utilize the property it had purchased. The Plaintiffs' claims are inconsistent with the language of Article VI, § 13 of the South Dakota Constitution, providing for just compensation when "private property" is taken or damaged for public use. Further, Plaintiffs have not cited any decision permitting an inverse condemnation claim where the governmental activities which allegedly caused the damage occurred on publicly-owned property. Plaintiffs therefore cannot satisfy the "private property" element of an inverse condemnation claim.

[¶39.] Nonetheless, Plaintiffs maintain that selling the surface property to private owners while retaining the mineral rights to the property to the present date renders the State strictly liable for any damage to their private property that has occurred or will occur in the future as a result of the prior mining activities on the property. Because the State reserved the mineral rights, as is required by law, Plaintiffs argue that "the subsurface owner must leave sufficient support for the surface to remain in its natural condition."[7] Plaintiffs argue that the State's

---

7. Plaintiffs argue that Restatement (Second) of Torts § 817 (1979) (withdrawal of lateral support) and Restatement (Second) of Torts § 820 (1979) (withdrawal of subjacent support) create strict liability for any damage caused by the failure of the subsurface owner to provide subjacent support for

(continued . . .)

retention of the subsurface estate (mining rights) after selling the surface rights to private owners has caused damage to private property owners and is a public use pursuant to Article VI, § 13 of the South Dakota Constitution because the gypsum deposits "could be mined in the future if mining technology advances to the point that extracting those deposits becomes economically viable."

[¶40.]    Even if we were to classify the State's retention of the subsurface rights, after completing its mining and reclamation activities on the property, an activity causing damage to private property, the Plaintiffs have failed to establish that the State's retention of the mining rights to the property is a "public use" under the damaging clause of the South Dakota Constitution.  We defined "public use" long ago in *Illinois Central Railroad Co. v. East Sioux Falls Quarry Co.*, 33 S.D. 63, 144 N.W. 724, 728 (1913), and again addressed the definition in *Benson v. State*, 2006 S.D. 8, ¶¶ 42, 88, 710 N.W.2d 131, 146, 163.  We adopted the "use by the public test," which "requires that there be a 'use or right of use on the part of the public or some limited portion of it[.]'" *Benson*, 2006 S.D. 8, ¶ 42, 710 N.W.2d at 146 (alteration in original) (citing *Ill. Cent. R.R. Co.*, 144 N.W. at 728).

[¶41.]    More recently, we have clarified that "the term *public use*, as used in Article VI, simply means 'use by the public[.]'" *Montana-Dakota Utils. Co. v. Parkshill Farms, LLC*, 2017 S.D. 88, ¶ 10, 905 N.W.2d 334, 338 (alteration in

---

(. . . continued)
    the surface owner's property.  *See, e.g.*, *Ambrosia Land Invs., LLC v. Peabody Coal Co.*, 521 F.3d 778, 785 (7th Cir. 2008) ("[L]iability depends not on fault but arises from its absolute duty to provide the surface with support[.]" (citing *Wilms v. Jess*, 94 Ill. 464 (1880))).  However, Plaintiffs must first establish a viable inverse condemnation claim to maintain their claims for strict liability.

original) (quoting *Ill. Cent. R.R. Co.*, 144 N.W. at 728). "[T]he matter that is controlling . . . is not the *necessity* of the use, not even the *fact of use*, but the *right to use*." *Id.* (alterations in original) (citation omitted). "As long as every member of the public has an equal right to use the [goods] produced by the facility, it does not matter how many use the [goods] or that not every person benefits from the facility's use." *Id.* ¶ 13, 905 N.W.2d at 339 (quoting 2A Julius L. Sackman, *Nichols on Eminent Domain* § 7.05(4)(d)). Under the public use test, South Dakota citizens and the public do not have the right to use the mining rights retained by the State or to appropriate any of the gypsum should the State ever decide to mine gypsum from this location in the future.

[¶42.]     Additionally, the Plaintiffs' claims for inverse condemnation based upon an alleged ongoing duty on the part of the State, as the subsurface owner, to permanently provide subsurface support to private property owners lacks any discernable public use. Plaintiffs seemingly acknowledge that mining gypsum is not currently economically feasible, and they have not identified any other public use of the State's ownership of the mining rights to the property. "The underlying intent of the [damaging] clause is to ensure that individuals are not unfairly burdened by disproportionately bearing the cost of projects intended to benefit the public generally." *Rupert*, 2013 S.D. 13, ¶ 9, 827 N.W.2d at 61 (citation omitted). Plaintiffs have failed to show any general public benefit from the State's ownership of the mining rights to the property within the meaning of Article VI, § 13 of the South Dakota Constitution. This case is unlike *Rupert*, where the city intentionally used deicer on the streets for the safety of the public, and the deicer runoff damaged

private property. Similarly, in *Long*, damage occurred as a result of the initial construction and subsequent resurfacing project that installed an inadequate culvert, which damaged the plaintiff's private property. In both *Rupert* and *Long*, the governmental entities involved were intentionally providing a benefit to the public through the ongoing maintenance and construction of streets and highways. Here, neither the State's ownership of the mining rights to the property, nor the alleged failure of the State to provide adequate subsurface support to the surface owner, are intended to benefit the general public.

[¶43.]    Applying the use by the public test, the Cement Plant's prior surface mining operations and resulting minerals were for proprietary and commercial use, not for "public use." Under these facts, Plaintiffs cannot satisfy the "public use" element of an inverse condemnation claim. Because we may "affirm the circuit court on summary judgment if it is correct for any reason," we conclude the circuit court did not err in granting summary judgment to the State. *A-G-E Corp. v. State*, 2006 S.D. 66, ¶ 13, 719 N.W.2d 780, 785 (citation omitted).

[¶44.]    Based upon our conclusion that the State's activities in this case relating to the mining and ownership of the subject property did not constitute a taking or damaging of private property for a public use, Plaintiffs have not established a claim for inverse condemnation. We need not address Plaintiffs' claims of strict liability, nor the State's claims that the action should also be dismissed on the basis of causation, standing, or that the action is untimely under SDCL 15-3-1.

[¶45.] While we acknowledge the devastating and sympathetic circumstances in which Plaintiffs find themselves, our review is limited to the claims before us, and Plaintiffs have not presented viable claims against the State in the present action.

## Conclusion

[¶46.] We affirm the circuit court's grant of summary judgment because Plaintiffs have failed to prove that a genuine issue of material fact exists regarding whether the Cement Plant's activities constitute a taking or damaging of private property for public use.

[¶47.] JENSEN, Chief Justice, and SALTER, DEVANEY, and MYREN, Justices, concur.

[¶48.] GUSINSKY, Justice, not having been a member of the Court at the time this action was considered by the Court, did not participate.